# JOINT VENTURE AGREEMENT - CONSTRUCTION

THIS JOINT VENTURE AGREEMENT ("Agreement"), made and entered into this *5ᵗʰ* day of *March*, 2008, by and among Kiewit Louisiana Co., (hereinafter called "Kiewit"); Massman Construction Co. (hereinafter called "Massman"); and Traylor Bros., Inc. (hereinafter called "Traylor"), individually referred to as a "Party" and jointly referred to as the "Parties."

This Agreement is made with the following Recitals of facts and objectives as background:

A.     Louisiana Department of Transportation, ("Owner") has advertised for a bid for the construction of the Huey P. Long Bridge Widening (Westbank and Eastbank Approaches and Main Bridge Deck Widening), ("Project") on which bids are to be submitted on or about February 20, 2008.

B.     The Parties have agreed to form a joint venture ("Joint Venture") to submit a joint bid ("Bid") and, if possible, to obtain a contract ("Prime Contract") with the Owner for the performance of the Prime Contract, including any additions or modifications thereof and completion of the Project (collectively the "Work") and for no other purposes.

C.     Each of the Parties to this Agreement is now, and has been, engaged in the construction industry.

D.     Each of the Parties to this Agreement acknowledges that each of them possesses skills and expertise unique in the construction industry necessary not only for the formation of this Joint Venture, but for the successful performance and completion of the Work.

E.     Each of the Parties to this Agreement acknowledges that by executing this Agreement the Party undertakes and assumes various duties towards performance and completion of the Work which duties, and the performance thereof, are unique to the skills and expertise of the Party.

F.     Each of the Parties to this Agreement acknowledges that it has a substantial interest in having each of the other Parties hereto perform their respective unique skills, expertise and duties, all as required for the performance and completion of the Work.

G.     The Parties desire to enter into this Agreement in order to fix and define between themselves their respective responsibilities, interests and liabilities in connection with the submission of the Bid and the performance and completion of the Work, in the event the Prime Contract is awarded to them.

NOW, THEREFORE, in consideration of the Premises and in order to consummate the intent of the Parties set forth in the foregoing Recitals, which Recitals are made an integral part of this Agreement, the Parties agree as follows:

1

**EXHIBIT B**

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

---

## ARTICLE 1

1.    FORMATION OF JOINT VENTURE.

     1.1    Formation. The Parties agree to constitute themselves as joint venturers for the purpose of submitting the Bid and for the further purpose of performing and completing the Work in the event that the Prime Contract is awarded to them. The Parties further agree that the Bid, if submitted, and the Work, if the Prime Contract is awarded to them, shall be performed and completed by them as a Joint Venture. The Parties agree that the Joint Venture shall exist as a separate legal entity, distinct from each of the Parties.

     1.2    Scope.   This Agreement shall extend only to fixing and defining the Parties' responsibilities, interests and liabilities relative to the submission of the Bid and the performance and completion of the Work, and shall have no other purpose.

     1.3    Relationship.  Nothing contained in this Agreement shall create or be interpreted or construed so as to create any permanent relationship between the Parties or limit their respective rights to carry on their individual businesses for their own benefit, including other work for the Owner which does not relate to the Project.

     1.4    Nature of Agreement. Each of the Parties acknowledges and declares that the Project is of a unique nature, taking into account the specifications, the technical and engineering expertise required to construct the Project, certain unique technological, engineering and other features of the Project, the size of the Project and the Work, and the financial commitments by the Parties in respect thereof. Each of the Parties further acknowledges and declares that it is entering into this Agreement with the other Party or Parties because each other Party is uniquely suited to participate in the construction of the Project due to each Party's prior experience in constructing projects of a type generally similar to the Project, including the Parties' unique ability to jointly construct the Project based on the integration among their workforce, financial stability, general compatibility in business ethics and approach to work, experience in bidding and managing work, knowledge of specialty equipment, know-how and other resources required for the efficient, timely, profitable and successful construction of the Project, the liability issues associated with construction of the Project, and the superior skills and experience of the Parties' management and supervisory team assigned to the Project.

     1.5    Personal Services Contract. For the reasons set forth herein, it is the Parties' intent that this Agreement and the Parties' rights and obligations thereunder be treated as a personal services contract, which is not assignable, transferable or delegable without the consent of the other Party or Parties, and no Party shall be required to accept or deliver performance to any person or entity other than to each of the Parties hereto.

     1.6    Principal Office. The principal office of the Joint Venture shall be located at the Project site or as otherwise determined by the Policy Committee.

KMTC JV-02303

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

1.7   Term. (a) The term of the Joint Venture shall be from the date of this Agreement until terminated and dissolved and the business and affairs of the Joint Venture wound up as provided in this Agreement.

(b) This Agreement and the Joint Venture shall terminate and dissolve automatically and without notice, and the business and affairs of the Joint Venture shall be wound up: (i) in the event that after the conclusion of all bid selection processes, including any bid protest procedures, the award of the Prime Contract is not made to the Joint Venture; or (ii) if the Joint Venture enters into the Prime Contract with the Owner, when all responsibilities of the Joint Venture under the Contract have been fulfilled, all liabilities have ceased, all accounts with the Owner have been settled and all profits, remaining assets of the Joint Venture and other amounts have been distributed to the Parties in accordance with the provisions of this Agreement.

(c) Notwithstanding anything contained herein to the contrary, if claims of any nature or legal action of any type are brought against the Joint Venture or any of the Parties at any time after the Joint Venture has otherwise been terminated and dissolved and its business and affairs wound up, which claims or legal action relate to or arise out of this Agreement, or the performance and completion of the Work, this Agreement shall nevertheless be considered to have remained in full force and effect and the rights and obligations of the Parties with respect to the resolution of such matters shall be determined by this Agreement.

(d) Except as otherwise specifically set forth herein, no Party shall have any right to withdraw or disassociate from the Joint Venture.

1.8   Title to Joint Venture Property. Title to all Joint Venture property, including all money, equipment, materials, supplies and other property acquired by the Joint Venture, shall be held in the name of the Joint Venture. No Party shall individually have any ownership interest or rights in the Joint Venture property, except, indirectly by virtue of such Party's ownership of an interest in the Joint Venture. No Party shall have any right to seek or obtain a partition of the Joint Venture property, nor shall any Party have the right to demand or receive specific assets of the Joint Venture upon the liquidation of or any distribution from the Joint Venture.

1.9   Party Obligations. Except as otherwise provided herein, each Party agrees to fulfill any obligations of the Prime Contract that by their nature can only be fulfilled by an individual Party as opposed to the Joint Venture.

**ARTICLE 2**

2.   BID AND AWARD.

2.1   Bid and Award. The Bid, if made, and the Prime Contract, if awarded to the Joint Venture, shall be made and entered into in the name of Kiewit/Massman/Traylor Constructors, a Joint Venture. The Prime Contract, if awarded to the Joint Venture shall be carried out and performed by the Parties in the name of the Joint Venture.

3

KMTC JV-02304

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

2.2    Withdrawal Prior to Bid.  The Parties intend that the Bid, including the terms of the Prime Contract, will be acceptable to each and all of them.  If the Bid is not acceptable to any Party or Parties, they may withdraw from the Joint Venture, which withdrawal will be treated as a disassociation of such Party from the Joint Venture.  The withdrawing Party or Parties cannot otherwise participate in bidding or proposing to the Owner for the Project without the written consent of all other Parties.  The remaining Party or Parties are free to continue the Joint Venture and submit a bid or dissolve the Joint Venture and submit a bid in the same name or in a new name.  A Party that withdraws prior to the Bid shall not be entitled to any further participation in the profits, management or otherwise of the Joint Venture.

2.3    Costs and Expenses. Each Party shall individually bear all costs it may incur in securing the award of the Prime Contract and no reimbursement of any Bid and pre-award costs will be made to any Party by any other Party or by the Joint Venture, unless otherwise agreed in writing. If a stipend is provided by the Owner, the Parties will share the stipend in accordance with their Share of Profits.

2.4    Related Agreements. The Parties shall from time to time execute such bonds and indemnity agreements, including applications therefor, and other documents as may be necessary in connection with the performance and completion of the Work.  It is the intent of the Parties that if performance and payment bonds are required by the Prime Contract, they shall be executed by a surety (or co-sureties) with a surety relationship with each Party.

**ARTICLE 3**

3.    ALLOCATION OF PROFITS, LOSSES AND DISTRIBUTIONS.

3.1    Share of Profits. Except as otherwise provided in Article 7, the interests of the Parties in any profits, and their beneficial interest in all property and equipment acquired and all moneys received in connection with the performance and completion of the Work ("Share of Profits") shall be as follows:

| Party | Percentage |
|-------|-----------|
| Kiewit | 51.0% |
| Massman | 24.5% |
| Traylor | 24.5% |

3.2    Share of Losses. The interest of the Parties in any losses and liabilities that may result from the performance and completion of the Work ("Share of Losses") shall be those percentages as set forth in Section 3.1. Notwithstanding the foregoing or anything in this Agreement to the contrary, in the event the profits of the Joint Venture are insufficient to fully repay all "Working Capital Loans" (as defined in Section 7.3(e)) and all interest due thereon, and such monies are not recovered from each "Defaulting Party" (as defined in Section 7.1) to which such Working Capital Loans have been made, the Parties without Working Capital Loans shall each bear the proportionate share of a Defaulting Party's deficiencies that their Share of Losses bears to the total Share of Losses held by the Parties without Working Capital Loans.

4

KMTC JV-02305

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

3.3   Reimbursement. If for any reason a Party sustains any liabilities or is required to pay any losses arising out of or directly connected with the performance or completion of the Work, or the execution of any surety bonds or indemnity agreements in connection therewith, which are in excess of its Share of Losses, each of the other Party or Parties shall promptly reimburse such Party the amount of the losses paid and/or liabilities assumed by such Party that are in excess of such Party's Share of Losses, so that immediately after such reimbursement, each Party will have paid the proportionate share of any such amounts equal to its Share of Losses.

3.4   Indemnification. To further assure the intent of this Article 3, each of the Parties agrees to indemnify all other Parties against, and to hold all other Parties harmless from, any and all losses and liabilities arising out of the performance and completion of the Work that are in excess of such Party's Share of Losses. The provisions of this Section 3.4 shall be limited to losses and liabilities that are directly relating to, or arising out of, the performance and completion of the Work or the execution of any bonds or indemnity agreements in connection therewith, and shall not relate to or include any incidental, indirect or consequential losses or liabilities that may be sustained or suffered by a Party.

3.5   Setoff. Each of the Parties hereto (the "Exercising Parties") and the Joint Venture, acting on behalf of the Exercising Parties, shall have the absolute right to set off any and all distributions of profits and/or Joint Venture assets or returns of "Working Capital" (as defined in Section 6.1), due any other Party (the "Other Party") pursuant to this Agreement or any other agreement involving any or all of the Exercising Parties or any of their affiliates or subsidiaries and the Other Party or any of its affiliates or subsidiaries, referred to herein as the "Other Agreements", against all amounts due to the Exercising Parties or any of their affiliates or subsidiaries by the Other Party or any of its affiliates or subsidiaries pursuant to this Agreement or any Other Agreement (including amounts representing a "Working Capital Loan" as defined in Section 7.3(e)).

3.6   Recoupment. Each of the Parties hereto (the "Recouping Parties") and the Joint Venture, acting on behalf of the Recouping Parties, shall have the absolute right to recoup any and all amounts due from a "Defaulting Party" (as defined in Section 7.1) pursuant to this Agreement or any Other Agreement involving any or all of the Recouping Parties or any of their affiliates or subsidiaries and the Defaulting Party or any of its affiliates or subsidiaries against all amounts due the Defaulting Party pursuant to this Agreement or any Other Agreement involving any or all of the Recouping Parties or any of their affiliates or subsidiaries and the Defaulting Party or any of its affiliates or subsidiaries.

3.7   Employee Claims. Except to the extent insurance coverage is provided under the Joint Venture Insurance Program described in Exhibit A, each Party (the "Employing Party") agrees to protect, defend, indemnify and hold the Joint Venture and each other Party, their respective agents, officers, directors and employees free and harmless from and against any and all claims, losses, cost, demands, suits and causes of action and every other claim or litigation (including all costs thereof and attorney's fees) of every kind and character which may be brought against each other Party and the Joint Venture by any employee of the Employing Party performing services for the Joint Venture but not actually placed on Joint Venture payroll. Each Party shall waive and/or require its insurers to waive subrogation against each other Party and the Joint Venture for liability assumed by each of the Parties above.

5

KMTC JV-02306

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

## ARTICLE 4

4.    POLICY COMMITTEE.

4.1    Establishment. The management of the Joint Venture shall be conducted pursuant to policy established by the Parties acting through a committee ("Policy Committee") which is hereby established.

4.2    Representatives. (a) Each Party shall have one vote on the Policy Committee.  For such purpose each Party hereby designates the following representatives to exercise such vote:

| Party | Representatives | Alternates |
|---|---|---|
| Kiewit | Keith Sasich | Randy Sanman |
| Massman | Keith Jacobson | Henry Massman |
| Traylor | Tom McCarthy | Christopher Traylor |

(b) Except as provided in Section 4.2(c) below, upon the occurrence of any "Event of Default" (as defined in Section 7.1), the Defaulting Party's representative on the Policy Committee shall have no right to participate in the affairs of the Joint Venture or vote on the Policy Committee.  All acts, consents and decisions with respect to the performance and completion of the Work shall thereafter be taken solely by the remaining Party or Parties.  Subject to the satisfaction of the non-defaulting Party's or Parties' obligations specified in Section 7.3(c), the votes of the Defaulting Party on the Policy Committee shall be allocated to the non-defaulting Party or Parties, in the same ratio as each non-defaulting Party's Share of Profits relates to the total Share of Profits of the non-defaulting Parties.

(c) Subject to the approval of the non-defaulting Parties, after the occurrence of an Event of Default by a Defaulting Party resulting from a breach of its obligations specified in Section 6.1, a Defaulting Party's representative(s) on the Policy Committee may once again be entitled to participate in the affairs of the Joint Venture and vote on the Policy Committee, but only after either (i) all of the "Working Capital Loans" (as defined in Section 7.3(e)) and interest have been paid by the Defaulting Party, or (ii) distributions by the Joint Venture to the non-defaulting Parties have included repayment of all Working Capital Loans and interest; provided, however, that in such event the Defaulting Party shall only be entitled to the number of votes equal to its remaining Share of Profits, as adjusted and determined pursuant to Section 7.3.

4.3    Alternate Representatives. Each Party may, at any time, substitute an alternate in place of any of its above-named representatives by serving written notice to all the other Parties.  Each Party's representative or alternate representative on the Policy Committee is hereby granted and shall hereafter possess authority to act for such Party on all matters of interest to it with respect to its participation in the Joint Venture.

4.4    Voting. The parties intend that all decisions of the Policy Committee should be unanimous, if possible.  If the parties are unable to reach a unanimous decision the policy in question will be decided by majority vote provided, however, that the policy issue in question may, at the election of any Party hereto, be referred to the Chief Executive Officer level of each of the parties for Resolution.

6

KMTC JV-02307

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

Matters not resolved at the Chief Executive officer level may be referred to dispute resolution as set forth in Article 12.

4.5     Powers. The Managing Party (as designated in Section 5.1) is hereby empowered to have direct charge and supervision of all matters necessary to and connected with the performance and completion of the Work. Notwithstanding, the following decisions shall be made by the Policy Committee and are not delegable to any Party:

(a)  To determine the time and place of holding its meetings and to establish the policies of the Joint Venture.

(b)  To determine and act upon the various matters, expressly or impliedly contained in other sections of this Agreement, which require decision by the Policy Committee.

(c)  To determine and act upon all significant matters of joint interest to the Joint Venture, including the purchase of any major equipment.

(d)  To determine insurance coverages and limits meeting the minimum requirements set forth in Exhibit A attached hereto, together with insurance reserves and reserves for other potential liabilities that may result from or arise out of the Project.

(e)  To consider material claims and disputes of any kind between the Joint Venture and the Owner, subcontractors and/or third parties and to authorize negotiation, arbitration, litigation and/or any other process for their resolution and to authorize the settlement thereof.

(f)  To elect the application of the remedies specified in Sections 7.3, 7.4 and 7.5 pursuant to Section 7.2.

(g)  To establish the exchange rental rates or sales values of any property between the Joint Venture and any Party or affiliate of any Party.

(h)  To establish the valuation of distributions of Joint Venture property to any Party or affiliate of any Party.

(i)  To determine whether to extend any loan from the Joint Venture to any Party or affiliate of any Party, not including Working Capital Loans as defined in Section 7.3(e).

4.6     Meetings. The Policy Committee shall generally perform its duties at regularly scheduled meetings, to be conducted quarterly, at which all designated representatives of the Parties are present. Where circumstances warrant, telephonic communication between all Party representatives or their alternates is authorized.

4.7     Costs and Expenses. Except as otherwise provided in the Additional Provisions of this Agreement, the salaries and expenses of each representative on the Policy Committee shall be borne by

7

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

the Party whom the representative has been designated to represent, and shall not constitute an expense of the Joint Venture.

## ARTICLE 5

5.    RIGHTS AND DUTIES OF THE PARTNERS; DELEGATION OF AUTHORITY.

5.1    Managing Party.  Kiewit is hereby designated as the Managing Party.  The Managing Party shall appoint an individual to act as the project manager for the Joint Venture (the "Project Manager").

(a)    Kiewit, as the Managing Party, may have corporate purchasing programs with certain vendors of supplies, equipment and materials that entitle the Joint Venture to base discounts on items purchased by the Joint Venture.  These discounts, when available, will be indicated on direct invoicing to the Joint Venture..

5.2    Delegation of Authority.  Any delegation of authority to any Party or individual or individuals may be revoked by the Policy Committee; provided, however, that if the authority of the individual serving as Project Manager is revoked, the Managing Party shall have the right and obligation to appoint another individual to serve in that capacity.

5.3    Authority to Bind.  No Party or individual shall have authority to act for or bind the Joint Venture or the other Parties except in connection with the performance and completion of the Work, and then only pursuant to authority delegated according to the provisions of this Agreement.

5.4    Tax Matters Partner.  For federal income tax purposes, the Managing Party shall be deemed the "tax matters partner".  For income tax purposes, notwithstanding any other provision of this Agreement, the tax matters partner shall determine the allocation of items of taxable income, losses, and other relevant items in compliance with applicable tax laws consistent with the economic arrangements of the Parties.

## ARTICLE 6

6.    WORKING CAPITAL REQUIREMENTS.

6.1    Determination of Amounts.  The Policy Committee shall determine the amount of capital required to carry out the performance and completion of the Work and to pay for any losses or liabilities resulting therefrom, said amount herein referred to as "Working Capital."  Upon such determination, each Party shall contribute the percentage of such Working Capital that is equal to its Share of Losses whenever requested to do so by the Policy Committee.  Such contribution shall be made within ten (10) days after request therefor. The Working Capital of a non-defaulting Party shall include any Working Capital Loans deemed made by such non-defaulting Party pursuant to Section 7.3(e).

KMTC JV-02309

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

## ARTICLE 7

7.    <u>EVENTS OF DEFAULT; ELECTION OF REMEDIES; REMEDIES.</u>

      7.1    <u>Events of Default</u>.  Each of the following will be considered an event of default ("Event of Default") by a Party ("Defaulting Party"):

          (a)  Any material breach of a Party's obligations under this Agreement, including, but not limited to:

              (i)  a Party's failure to promptly contribute its required amount of Working Capital in accordance with the Agreement,

              (ii)  a Party's attempted assignment, transfer and/or delegation (whether or not such attempt is held valid and binding) of all or any portion of its rights or obligations under this Agreement or the Prime Contract; or(iii) the inability of a Party to obtain the signature of its surety on all bonds required of the Joint Venture for the Project.

          (b)  Any post-Bid act of disassociation of a Party without the consent of the other Parties.

          (c)  The following insolvency Events of Default ("Insolvency Event of Default"):

              (i)  a Party's voluntarily filing of a petition or commencing other proceedings seeking reorganization, liquidation, arrangement or other similar relief under any federal or state law relating to bankruptcy or insolvency;

              (ii)  a Party's seeking, consenting to or acquiescing in the appointment of a receiver, liquidator, assignee, trustee, sequestrator or other similar official for itself or for a substantial part of its property;

              (iii) a Party's making of an assignment for the benefit of creditors;

              (iv)  a Party's being adjudged a bankrupt or insolvent, or inability to pay its debts generally as they become due;

              (v)  a Party's consent to the commencement or continuation of bankruptcy, reorganization, liquidation, insolvency or similar proceedings against it or a Party's filing an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Party in any proceeding of this nature; or

              (vi)  a Party's failure, within 90 days after commencement, to have dismissed any proceeding against it seeking reorganization, liquidation, dissolution or similar relief under any statute, law or regulation, or failing within 90 days after the appointment without the Party's consent or acquiescence, to have vacated or stayed the appointment of a trustee,

KMTC JV-02310

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

receiver or liquidator of the Party or all or any substantial part of the Party's properties, or failing, within 90 days after the expiration of any stay, to have the appointment vacated.

(d) Any material misrepresentation of a Party's financial position presented to the Parties in conjunction with the formation of this Agreement.

The occurrence of an Insolvency Event of Default shall be an act of wrongful disassociation from the Joint Venture on the part of the Defaulting Party. It shall not cause the Joint Venture to terminate, dissolve, wind-up, liquidate or be the subject of any other similar events or proceedings except as otherwise allowed. The Joint Venture may continue in existence even in the event of one remaining non-defaulting Party.

7.2     Election of Remedies. Upon any Event of Default, the Policy Committee may elect the remedies outlined in Sections 7.3, 7.4, 7.5, as applicable, or any other remedy allowed by law. The remedies of the Parties set forth herein with respect to an Event of Default are in addition to, and not in derogation of, any other rights or remedies which any Party may otherwise have at law or equity. In addition, the election of one or more of the remedies specified above with respect to any Event of Default shall not preclude the election of the same or a different remedy upon the occurrence of a subsequent Event of Default. In the event that for any reason any of the remedies outlined in this Article 7 are not enforced, the other remedies and any remedy allowed by law, to the extent applicable, shall be available.

7.3     Remedies for Failure to Contribute. If a Defaulting Party fails to contribute its share of Working Capital as specified in Section 6.1, the Policy Committee may elect the following remedy upon notice to the Defaulting Party:

(a) A Defaulting Party's Share of Profits shall be decreased, and the other Parties Share of Profits shall be increased proportionately, so that the respective interests of the Parties in the Joint Venture profits shall be in the same proportion as their Working Capital actually contributed.

(b) A Defaulting Party's share in Joint Venture losses shall in all events remain the same as the Defaulting Party's Share of Losses, and nothing contained in this Agreement nor any events hereafter occurring shall under any circumstances reduce a Defaulting Party's Share of Losses.

(c) The non-defaulting Parties may mutually agree as to the amount of Working Capital that each will contribute to make whole the deficiency created by a Defaulting Party; provided that in the event the non-defaulting Parties are unable to so agree, such amount shall be treated as a request for Working Capital by the Policy Committee and each non-defaulting Party shall contribute a portion of such amount in the same ratio as their Share of Profits relates to the total Share of Profits of the non-defaulting Parties. Failure to make such payment shall constitute an Event of Default.

(d) Reduction in a Defaulting Party's Share of Profits and increases in the Share of Profits of the other Parties shall be calculated as of the time of each Event of Default. The Defaulting Party's Share of Profits will not be reinstated under any circumstance.

10

KMTC JV-02311

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

(e)   Any contributions made by the non-defaulting Parties to the Joint Venture to make whole the deficiency created by the Defaulting Party shall be deemed a loan made by the non-defaulting Parties to the Defaulting Party ("Working Capital Loan(s)"), which loan shall at all times from and after the date such Working Capital Loan is made be immediately due and shall be payable on demand and bear interest, compounded daily, at an annual rate of three percent (3%) above the prime rate of interest published from time to time in *The Wall Street Journal* (but not to exceed the maximum allowed by law).  Interest shall be payable to the Joint Venture for the account of the non-defaulting Parties. Upon the making of a Working Capital Loan the right of the Defaulting Party or any of its affiliates or subsidiaries to profits and return of Working Capital shall be deemed assigned to the non-defaulting Parties in an amount equal to the sum of such Working Capital Loans made to the Defaulting Party and any of its affiliates and subsidiaries by the non-defaulting Parties, including accrued interest, until the Working Capital Loan(s) and accrued interest are fully repaid.

(f)   Any unpaid Working Capital Loans, including all interest thereon, shall be deducted from any distributions due a Defaulting Party and, if upon final settlement of the Joint Venture accounts, such amounts otherwise due a Defaulting Party are insufficient to meet such deduction, a Defaulting Party shall, on written demand of the non-defaulting Parties, pay such deficiency to the Joint Venture for the account of the non-defaulting Parties. The non-defaulting Parties shall be entitled to receive the greater of the interest above described upon the Working Capital Loan or the amount by which they received additional profit due to the increase in their Share of Profits, as described in Section 7.3(a) above, but not both.

(g)   Any distributions of Working Capital, Joint Venture assets and/or profits otherwise distributable to a Defaulting Party shall first be applied to the payment of the interest due the non-defaulting Parties, then to the payment of the Working Capital Loans to the accounts of the non-defaulting Parties who made such Working Capital Loans, then to the non-defaulting Parties for their Working Capital contributed at or subsequent to the Event of Default by the Defaulting Party, before any distributions of Working Capital, Joint Venture assets and/or profits are made to the Defaulting Party.

(h)   A Defaulting Party shall have no right, title or interest in any Working Capital, assets or profits until such time as all payments to the non-defaulting Parties or to the Joint Venture for distribution to the non-defaulting Parties is made, as provided in Section 7.3(g).

(i)   Notwithstanding any provision in the Agreement to the contrary, the Parties making Working Capital Loans may, at any time, bring suit in a court of competent jurisdiction against the Defaulting Party for payment of the Working Capital Loans and any interest due thereon and shall, in addition, be entitled to recover reasonable attorney fees and such other relief that may be granted by the court.

7.4   Purchase of Defaulting Party's Interest. The Policy Committee may, upon the providing of written notice to the Defaulting Party, elect the following remedy upon an Event of Default:

(a)   The Defaulting Party shall cease to have any interest in or rights with respect of the Joint Venture and this Agreement, other than the rights provided for by Section 7.4(b) and the obligations

11

KMTC JV-02312

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

provided for by Section 7.4(c) hereof. This Agreement shall continue in full force and effect as among all remaining non-defaulting Parties; and to the extent that there is only one remaining non-defaulting Party, this Agreement shall continue to govern the business and affairs of the Joint Venture and the remaining Party's rights, obligations and powers as to the Joint Venture.

(b) Within sixty (60) days from the date of written notice by the Policy Committee of the election of the remedy of this Section 7.4, the Policy Committee shall prepare a detailed cost report as of the date of the Event of Default. The cost report will be used to determine the job profit/(loss) earned or incurred at the date of the Event of Default. The purchase price shall be the Defaulting Party's Share of Profit in such earned profit, if any, adjusted to reflect any unpaid amounts owed by the Defaulting Party to the other Parties or to the Joint Venture. In all cases where an Event of Default occurs prior to submission of the Bid, the purchase price of the Defaulting Party's interest will be $0. Each of the non-defaulting Parties shall purchase a portion of the Defaulting Party's interest in the Joint Venture that is in the same ratio that the non-defaulting Party's Share of Profit bears to the total Share of Profit held by the non-defaulting Parties. In no event will any payment be made for anticipated or unearned profits of the Joint Venture. Failure to make such purchase by a non-defaulting Party shall constitute an Event of Default as if such Party had failed to contribute its share of Working Capital.

(c) The Defaulting Party shall be charged with, and shall remain liable for, any and all losses that may be suffered by the Joint Venture, or any additions or supplements thereto or modifications thereof, to the full extent of the Defaulting Party's Share of Losses, Working Capital Loans and any interest due to the non-defaulting Parties to the full extent of the provisions set forth in Section 7.3 above. Such liability shall cease, however, upon purchase of the Defaulting Parties' interest as provided in this Section 7.4.

7.5    Other Remedies.  The Policy Committee may elect to terminate and dissolve the Joint Venture and wind up its business and affairs , and the Defaulting Party shall be charged with, and shall continue to be liable for, any and all losses that may be suffered by the Joint Venture under the Prime Contract, or any additions or supplements thereto or modifications thereof, to the full extent of the Defaulting Party's Share of Losses and any Working Capital Loans and any interest due to the non-defaulting Parties to the full extent of the provisions set forth in Section 7.3 above. The Defaulting Party will have no right to distribution of any profits or assets of the Joint Venture.

## ARTICLE 8

8.    SECURITY AGREEMENT AND COLLATERAL.

8.1    Security Agreement. To secure the prompt and complete (a) payment of their respective shares of Working Capital including, without limitation, any Working Capital Loans, including any interest thereon; and (b) the performance by the Party of its commitments, undertakings and other agreements, under this Agreement and the Prime Contract, each Party hereby assigns, pledges and grants to the other Parties a continuing security interest in and to the Collateral, as defined in Section 8.2, whether now owned or existing or hereafter acquired, and wheresoever located. Each Party irrevocably constitutes and appoints the Managing Party and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place

12

KMTC JV-02313

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

and stead of each Party and in the name of each Party or in its own name, from time to time in the Managing Party's discretion, for purposes of carrying out the terms of this Section 8.1, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Section 8.1.

8.2    Collateral. For the purposes of this Agreement, Collateral shall mean the following: all of each Party's right, title and interest in and to, whether now existing or hereinafter acquired: (a) the Joint Venture, this Agreement, the Prime Contract, Joint Venture equipment, the Project, and all proceeds and products thereof; (b) all cash, proceeds, accounts, or right to payments of any kind whatsoever, made pursuant to this Agreement, the Prime Contract, the Project and all proceeds and products thereof; and (c) now owned or hereafter acquired general intangibles, as said term is defined in the Uniform Commercial Code, or the variation thereof as adopted in the state with proper jurisdiction over the Collateral or this Agreement which result from this Agreement or the Prime Contract, and all proceeds and products thereof.

### ARTICLE 9

9.    JOINT VENTURE BANK ACCOUNTS.

9.1    Establishment of Bank Account. All contributions of Working Capital made by the Parties, all Working Capital Loans, and all other funds received by the Joint Venture in connection with the performance and completion of the Work (collectively the "Working Capital Funds") shall, subject to Section 9.3, be deposited in an account or accounts in such bank or banks as the Managing Party may designate which shall be separate from any bank accounts maintained by any Party.

9.2    Withdrawals. Withdrawals of Working Capital Funds may be made in such form and by such persons as the Policy Committee may from time to time delegate. All persons authorized to draw against the funds of the Joint Venture shall be bonded in such company or companies and in such amounts as the Parties may mutually determine.

9.3    Permissible Investments. The Parties agree that any Working Capital Funds may only be invested in the investments listed below, unless otherwise determined by the Policy Committee:

(i)    Institutional Money Market Fund (taxable or tax exempt)
(ii)   Western Asset Private Liquidity Fund, LLC

9.4    Delegation. Any delegation of authority under this Article 9 shall be as provided in Article 5.

### ARTICLE 10

10.    ACCOUNTING AND AUDITING.

KMTC JV-02314

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

10.1    Books. Separate books of account, maintained in accordance with accounting principles generally accepted in the United States, shall be kept by the Managing Party of the transactions of the Joint Venture. A Party to this Joint Venture may inspect such books at any reasonable time.

10.2    Reports. The Managing Party shall prepare and deliver to each Party, 1) within 25 days after the end of each calendar month, and 2) within 30 days after the end of each fiscal year, a profit and loss statement, a statement of cash flows, a balance sheet, a statement of Joint Venture capital, a projection of end of job financial results and a detailed cost report. Additionally, the Managing Party shall prepare and deliver to each Party 1) on or before the 1st day of the 3rd month after each fiscal year, a projection of taxable income attributable to each Party, and 2) on or before the 15th day of the 7th month after each fiscal year, such state and federal income tax returns and such other accounting, tax information and schedules as are required by the Parties for the timely and accurate completion of their tax returns. The timeframe for providing such tax information may be modified by mutual agreement of the Parties.

10.3    External Audits. Periodic external audits shall be made of such books at such times and by such persons as the Parties may direct or upon the written request of a Party and copies of the audit reports shall be furnished to each of the Parties. External audits must be requested at least 90 days prior to the end of each fiscal year in order to allow for the appropriate coordination. The cost of the external audits shall be borne by the requesting Party(ies) and shall not be an expense of the Joint Venture.

10.4    Final External Audit. Upon completion of the Work, a final external audit shall be made upon the written request of a Party and copies of such audit report shall be furnished to each of the Parties. The cost of the external audits shall be borne by the requesting Party(ies) and shall not be an expense of the Joint Venture.

10.5    Internal Audits. Any Party may request that their internal auditors be able to audit the books of the Joint Venture. At least 10 days prior notice of an internal audit must be provided to all Parties. When an internal audit has been requested, any Party may provide internal auditors to participate in the audit. Copies of the audit reports shall be furnished to each of the Parties. Each Party shall individually bear all costs it may incur in connection with any internal audit, and no cost of any internal audit shall be an expense of the Joint Venture.

10.6    Management Fee. The Managing Party shall receive a Management Fee of one percent (1.0%) of cost, as reflected in the cost report, paid on a monthly basis. The Management Fee shall be considered compensation for the added expenses incurred by the Managing Party in performing its duties, and shall be considered an expense of the Joint Venture.

10.7    Financial Statements of the Parties. Any Party to this Joint Venture Agreement (the 'Requesting Party') may request that the other Parties provide the Parties' financial statements and the consolidated financial statements of the other Parties' parent company on a periodic, but no more than annual, basis. In the event of such a request, the Requesting Party must provide its financial statements to the other Parties. Financial statements may be requested as frequently as quarterly by any member of the Joint Venture if there exists a reasonable indication of material change in the financial position of a Joint Venture member. Annual financial statements must be audited, provided within 90 days of the

14

KMTC JV-02315

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

fiscal year end of the entity and contain a balance sheet and related footnotes. Other financial statements when reasonably necessary to exchange between partners, must be provided within 45 days of the request and may be audited or unaudited and may exclude the related footnotes unless a material change to those footnotes has occurred.

**ARTICLE 11**

11.   DISTRIBUTION OF ASSETS.

   11.1   Distributions. The Policy Committee may determine from time to time during the course of this Agreement that some of the Joint Venture assets may be distributed to the Parties in accordance with their Share of Profits. The Parties agree that all distributions will be treated as advances pursuant to Treasury Regulation Section 1.731-1(a)(1)(ii).

   11.2   Loans. In the event any of the Parties desires funds, it may request a loan from the Joint Venture to be repaid no later than the earlier of (i) said Party's disassociation from the Joint Venture or (ii) the termination and dissolution of the Joint Venture and the winding up of its business and affairs. The Policy Committee in its sole discretion shall be empowered to make such loans as it, in its sole discretion, deems proper at market interest rates: provided, however, nothing herein shall require the Policy Committee to make any such loan.

   11.3   Completion of Prime Contract. Upon the completion of the Work, including the resolution of all known claims and other liabilities of the Joint Venture, the remaining assets of the Joint Venture and the profits or losses accrued in the performance of the Work shall be divided in accordance with the Parties' Share of Profits.

**ARTICLE 12**

12.   DISPUTES.

   12.1   General. In the event of any dispute between the Parties, they shall exhaust every effort to settle or dispose of the same, including intervention by the respective management of the Parties. Should any dispute between the Parties affect or threaten the orderly or timely progress of the Work, the Parties shall proceed diligently with the Work as directed by the Managing Party in writing. In no event shall any dispute be allowed to delay the Work.

   12.2   Policy Committee. If a matter is not resolved at the Chief Executive Officer level, the majority decision of the Policy Committee regarding such dispute shall be final and binding unless the Disputing Party provides written notice to each of the other Parties of its intent to arbitrate the dispute pursuant to §12.3. Such notice must be provided no later than ten (10) days after Chief Executive Officer level individuals declare an impasse but no later than 45 days from the issuance of the majority decision by the Policy committee. The aggrieved Party's sole remedy will be for damages.

   12.3   Arbitration. Any dispute perfected as provided for in Section 12.2, or any controversy or claim arising out of or relating to this Agreement or the breach thereof, except as specifically provided

15

KMTC JV-02316

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

elsewhere in this Agreement, which is not adjusted or disposed of by mutual agreement of the Parties, shall be settled by arbitration under the current rules of the American Arbitration Association Construction Industry Rules, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Such decision shall be final and binding on the Joint Venture and on all Parties. The arbitration proceedings shall be filed in the Regional Office of the American Arbitration Association located nearest to the Project.

## ARTICLE 13

13.    MISCELLANEOUS.

13.1    Unenforceability. In the event that any part, term or provision of this Agreement is determined by a court of competent jurisdiction to be unlawful or unenforceable, the validity and enforceability of the remaining portions or provisions shall not be affected thereby.

13.2    Illegal Conduct. Each Party, through its execution of this Agreement, hereby individually certifies and attests to the other Party or Parties, and to the Owner, if required, that neither it nor any of its members, affiliates, or employees has participated in any antitrust activities or any other illegal anticompetitive activity with respect to the bidding and/or the obtaining the Prime Contract for which purpose this Joint Venture is being formed.

13.3    Entire Agreement. This Agreement constitutes the entire agreement between the Parties, and is subject to no other oral or written proposals, agreements or understandings whatsoever, and can only be supplemented or amended by a written document subscribed by the Parties.

13.4    Assignment. Each Party acknowledges and declares that based on Section 1.3 and 1.4 hereof, the interests and rights of a Party in this Agreement, the Prime Contract and as a member of this Joint Venture, shall not be transferable, assignable or delegable, except that a Party may assign its share in any money to be received by it from the Joint Venture for the purpose of obtaining a loan or loans from any bank or other lending agency. Any such assignment, pledge, hypothecation or other collateralization of the proceeds or receivables of a Party to this Joint Venture shall be subordinate to any claims, offsets, adjustments and/or repayment of Working Capital Loans and interest to the nonassigning Party or Parties and the security interest granted in Section 8.1 hereof. Each Party acknowledges and declares that this Section 13.4 served as a material inducement of each Party's consent to enter into this Agreement, absent of which this Agreement would not have been entered into.

13.5    Headings. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

13.6    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original and each of which shall constitute one and the same Agreement. Each counterpart may consist of a number of copies hereof each signed by less than all, but together signed by all of the Parties. The exchange of signed copies of this Agreement and signature pages by facsimile transmission shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in

KMTC JV-02317

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

lieu of the original of this Agreement for all purposes. Signatures of the Parties transmitted by facsimile shall be deemed to be the original signatures for all purposes.

13.7   <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the state of Delaware as to all matters, including validity, construction, effect, performance and remedies, except as to its conflict of law rules.

13.8   <u>Non Waiver Language</u>. The failure of a Party at any time to insist on strict performance or to not avail itself of any available rights under this Agreement does not constitute a waiver of those rights.

13.9   <u>Parent Guarantees</u>. If a Party to this Agreement is a subsidiary of another entity, or is wholly or substantially owned by another entity, the senior most corporate parent or ownership entity shall furnish to the other Parties a guarantee of that Party's obligations hereunder in the form at Exhibit C hereto; however, with regard to Kiewit, the sole parent guarantee provided shall be by its immediate parent, Kiewit Southern Co.

## ARTICLE 14

14.   <u>ADDITIONAL PROVISIONS</u>.

14.1   <u>Additional Provisions</u>. The provisions, if any, listed on Exhibit B attached hereto ("Additional Provisions") are hereby incorporated into and made an integral part of this Agreement.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized officers or agents effective the day and year first above written.

KIEWIT LOUISIANA CO.

By: _____
Keith Sasich, President

MASSMAN CONSTRUCTION CO.

By: _____
Henry Massman, President

TRAYLOR BROS., INC.

By: _____
Chris Traylor, President

KMTC JV-02318

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

# EXHIBIT A

## INSURANCE PROGRAM

Kiewit Louisiana Co., on behalf of the Joint Venture, Massman Construction Co. and Traylor Bros., Inc. shall purchase and maintain the following minimum insurance during the term of this agreement:

1.  Workers' Compensation insurance (including USL&H), in the name of the joint venture, in accordance with statutory requirements and Employer's Liability insurance with limits of $2,000,000 for each accident.  The "loss limit" (deductible) under such policy shall not exceed $1,000,000 each accident and shall cover all joint venture employees and employees of Massman Construction Co. & Traylor Bros., Inc. specifically assigned to this project.

2.  Commercial General Liability insurance, in the name of the joint venture, with a $2,000,000 combined single limit for any one occurrence.  The deductible under such insurance shall not exceed $1,000,000 per occurrence and cover the liabilities of the joint venture, Massman Construction Co. and Traylor Bros., Inc. as related to this project.

3.  Automobile Liability insurance, in the name of the joint venture, covering any automobile with not less than a $2,000,000 combined single limit for any one accident. Such insurance shall be arranged on a guaranteed cost (no deductible) basis.

4.  Excess Liability insurance with a limit of $100,000,000 each occurrence and aggregate. Excess coverage is to be provided under Kiewit's blanket excess liability insurance program and shall be excess of the primary employer's liability, commercial general liability, automobile liability and protection & indemnity policies referenced in this Exhibit A. Any loss exceeding this limit shall be covered in each partner's own insurance program split in accordance with each partner's percentage of participation.

5.  Contractor's Equipment insurance covering all owned, rented and leased equipment.  The deductible shall not exceed $100,000 each claim.

6.  If agreed, "All-Risk" Builders' Risk insurance covering loss or damage to the Project.  Such policy shall be in an amount equal to the probable maximum loss of the Project with deductibles in accordance with commercially available terms and conditions.

7.  Ocean Cargo and/or Hull & Machinery/Protection & Indemnity insurance and Vessel Pollution Liability insurance covering permanent materials or barges (including cranes or other equipment declared along with the hull value of the barge) involved in ocean going shipments or while working at the project site. The Hull & Machinery insurance shall be in an amount equal to the fair market value of each vessel (including equipment on board) and the Protection & Indemnity insurance shall have limits of $2 million per occurrence. The Vessel Pollution Liability insurance shall have limits of $50 million per occurrence.

A-1

KMTC JV-02319

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

8. Any other such insurance as required by contract or as agreed to by the Parties.

9. Commercial General Liability and Excess Liability coverage in the name of the Joint Venture will include an extension of products and completed operations coverage for 2 years beyond final acceptance of the work.

10. The above insurance coverage shall include the Joint Venture as the named insured and the individual Parties and the employees of the Joint Venture as insureds or additional insured where appropriate with a waiver of subrogation in favor of such insureds. The joint venture, Massman Construction Co. and Traylor Bros., Inc. will each be issued their own workers' compensation policy.

11. Deductibles and/or self-insured retentions, if any, under the policies referenced in paragraphs 1, 2, 3, 5, 6 and 7, above, arranged in the name of the Joint Venture shall be borne by the Joint Venture.

A-2

KMTC JV-02320

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

# EXHIBIT B

## ADDITIONAL PROVISIONS

1. **SALARY AND BENEFIT TIME POLICIES.**

   1.1   Salaried Personnel on Joint Venture Payroll. Salaried personnel of the following Parties will be placed on the Joint Venture payroll: Kiewit. Such personnel ("Joint Venture Salaried Personnel") will be placed on the Joint Venture payroll at the same pay level as they hold at the time of transfer, subject to cost of living adjustments as may be established by or approved by the Policy Committee. Joint Venture Salaried Personnel will be paid on a weekly basis.

   (a)   Joint Venture Salaried Personnel shall accrue sick and vacation time on the Joint Venture payroll in accordance with the company policies of their respective Party. However, the Joint Venture is responsible only to pay for sick and vacation time taken to the extent that such time was earned while on the Joint Venture payroll (i.e., unused sick and vacation time cannot be "brought" to the Joint Venture by an employee). When a salaried employee of the Joint Venture is taken off the Project, if the employee has unused vacation time accrued during the employee's assignment on the Project, the Joint Venture will pay the employee's respective Party for that unused time. The Joint Venture will not make payment to the employee's respective Party for any unused sick time.

   (b)   Joint Venture Salaried Personnel will be paid for holidays in accordance with policies established by the Policy Committee.

   1.2   Hourly Personnel on Joint Venture Payroll. Hourly personnel of the Joint Venture will be paid in accordance with policies established by the Policy Committee, including policies for holidays, sick leave and vacation time.

   1.3   Personnel Not on Joint Venture Payroll. Personnel of the following Parties will not be placed on the Joint Venture payroll: Traylor; Massman. Salary and benefit time policies for such personnel ("Charged Personnel") shall be as set forth in §1.3(a), (b) and (c) below.

   (a)   On-site Charged Personnel. For Charged Personnel working directly on the Project at the Project office or on the Project site, payroll costs of the Parties shall be billed to the Joint Venture on the basis of direct salary times a multiplier to be determined by Policy Committee) to account for applicable payroll taxes, company-paid medical, dental, life and disability insurance benefits, and benefit time (holiday, sick, and vacation time), but not including incentive pay, pension or profit sharing plan contributions, or off-job overhead. Pension or other retirement-related benefits may be included in the multiplier if authorized by the Policy Committee. Such on-site Charged Personnel will charge time to the Project only for hours worked directly on the Project. Holidays will be taken by on-site Charged Personnel in accordance with policies established by the Policy Committee. On-site Charged Personnel

B-1

KMTC JV-02321

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

will take time off for sickness and vacation in accordance with the company policies of their respective Party.

(b) <u>Off-site Charged Personnel</u>. For Charged Personnel working directly on the Project but not at the Project office or on the Project site, payroll costs of the Parties shall be billed to the Joint Venture on the basis of direct salary times a multiplier to be determined by the Policy Committee to account for applicable payroll taxes, company-paid medical, dental, life and disability insurance benefits, benefit time (holiday, sick, and vacation time), and an allowance for office facilities (e.g., rent, utilities, furniture and equipment), but not including incentive pay, pension or profit sharing plan contributions, or off-job overhead. Pension or other retirement-related benefits may be included in the multiplier if authorized by the Policy Committee. Travel and per diem expenses for such off-site Charged Personnel on Project business shall be billed to the Joint Venture at invoice cost. Such offsite Charged Personnel shall be approved by the Project Manager if planned to be charged to the Project for less than 4 consecutive weeks. If offsite Charged Personnel are planned to be charged to the Project for a period greater than 4 consecutive weeks they shall be approved by the Policy Committee.

(c) <u>Overtime</u>. If overtime is paid to Charged Personnel working on the Project, adjusted (lower) salary multipliers will be used to calculate overtime charges to the Joint Venture to reflect the lower overhead associated with overtime labor.

1.4     <u>Non-chargeable Personnel</u>. Executive management, Policy Committee representatives, and other off-site management and administrative personnel of the Parties are not chargeable to the Joint Venture, including their travel and per diem expenses.

2.     <u>RELOCATION COSTS</u>.

2.1     Relocation costs of the Parties for their employees working at the Project office or at the Project site shall be billed to the Joint Venture in accordance with policies established by the Policy Committee.

B-2

KMTC JV-02322

Joint Venture Agreement
Kiewit/Massman/Traylor Constructors

# EXHIBIT C

### PARENT GUARANTEE

In consideration of the other Parties to this Joint Venture entering into this Joint Venture Agreement with _____ ,which Joint Venture is referred to as Kiewit/Massman/Traylor Constructors, a Joint Venture created for the purpose of bidding and potential subsequent performance of a certain contract with the Louisiana Department of Transportation for the construction of the project known as Huey P. Long Bridge Widening (Westbank and Eastbank Approaches and Main Bridge Deck Widening), _____ (Guarantor) guarantees to the other Parties of the Joint Venture the performance by _____ of all the terms and obligations on its part to be performed under the Agreement, subject to all rights and defenses that it has under the Agreement.

_____ (Guarantor)

By_____

Dated_____

C-1

KMTC JV-02323